IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION



KIM TILLMAN,                        )
                                    )
        Plaintiff,                  )          CIVIL ACTION NO.
                                    )          02-AR-3085-S
v.                                  )
                                    )
SOUTHERN COMMUNICATION              )
SERVICES, INC., d/b/a               )          **ENTERED**
SOUTHERN LINC,                      )
                                    )          NOV 1 7 2003
        Defendant.                  )


**MEMORANDUM OPINION**

Before the court is the motion of defendant, Southern
Communication Services, Inc., d/b/a Southern Linc ("Southern"),
for summary judgment.  Plaintiff, Kim Tillman ("Tillman"), brings
claims for race discrimination and retaliation pursuant to Title
VII of the Civil Rights Act of 1964, as amended, ("Title VII"),
and 42 U.S.C. § 1981 against Southern because she received a
"below target" evaluation and was subsequently terminated.[1]
Southern seeks summary judgment on all of Tillman's claims.

**Statement of Facts**

Tillman, who is black, began working for Southern as a
customer service representative on March 2, 1998.  Southern
promoted her on July 10, 1999 to customer service team leader and

_____

    [1] In Tillman's reply brief, she expressly abandons every claim
except her retaliatory discharge claim.  *See* Doc. #19 at n.1.
Southern is, accordingly, entitled to summary judgment on the
abandoned claims.



Jerry Fant became her immediate supervisor.  Fant disciplined
Tillman through a report dated December 20, 1999 for sending and
receiving "inappropriate, crude or pornographic emails."  In
response, Tillman claimed that another employee had obtained her
computer password and sent the pornographic email.  Southern
rejected her contention and demoted her to her former
classification, customer service representative.  The incident
also contributed to Tillman receiving a "below target" rating in
her 1999 evaluation.

Southern next transferred Tillman to the position of
accounts specialist.  There, Tillman had two immediate
supervisors.  An on-going department restructuring resulted in
Tracey Booker, who is black, becoming Tillman's supervisor during
the first half of 2000 and the first half of 2001, while Brian
Elliott, who is white, supervised Tillman during the second half
of 2000 and the second half of 2001.  Both supervisors
participated in evaluating Tillman.

The 2000 mid-year evaluation stated that Tillman needed to
"pay closer attention to detail" and "work on keeping an open
line of communication with her co-workers and [Elliott]."  In an
email, Tillman objected that the evaluation lacked positive
comments concerning her accomplishments:

> After receiving only derogatory, condescending and
> contradictory information on my Mid- year [sic]
> Performance review, You [sic] [referring to Elliott]
> stated , "you weren't aware of certain accomplishment

>[*sic*] and duties".; [*sic*] Only the negative and
>[somewhat] inaccurate attributes during my tenure have
>been noted based on your perception therefore, [*sic*]
>you have requested a detailed list of my accomplishment
>[*sic*] and achievements[.]

She included an accomplishments list in her email.

Tillman forwarded a copy of the email to a human resources
representative, Reggie Murchison, who is black, and complained
that Elliott was harassing and mistreating black employees under
his supervision.  Murchison and the human resources team leader,
Diane Hill, who is also black, investigated Tillman's complaints
about Elliott.  They found the allegations unfounded.  However,
Tillman's evaluation was revised so as to reflect some of the
accomplishments she claimed.

The 2000 year-end evaluation of Tillman rated her "at
target."  Southern promoted her to senior accounts specialist in
January 2001 and Booker again became her supervisor.  Under
Booker, Tillman's troubles continued.

In July, Tillman had a conflict with Carol Cook, a co-
employee and team leader, regarding the reconnection of a
customer's account.  In an email Tillman rebuked Cook:

>Please be advised .. I will handle this account... I
>have informed the customer of the amount to pay to
>reconnect.. [*sic*]
>
>I am not sure why [you] constantly give me a hard time
>about my / Gulf customers.....if you choose not to
>reconnect that's up to you.. [*sic*]

Willene Wyatt, another co-employee, heard Tillman reacting to

Cook's involvement with the account and slamming the door to the overhead bin at her desk.  When Wyatt approached Tillman about being upset, Tillman said, "Don't get in my face.  I ain't got nothing to say to you."

Under Booker, Tillman failed to follow procedures such as logging into phones, tracking calls, and keeping up with a daily payment log.  At about the time Tillman switched back to being supervised by Elliott, she told Booker and Elliott that she had too much work to do.  They tried to tell her how to prioritize her workload.

Several incidents occurred in October 2001.  Wyatt led a training session regarding "MiBAS," a new billing system.  While Tillman appeared for the training, she refused to participate in any hands-on elements.  Later that month, Carol Cook, another co-employee and team leader, asked Tillman not to schedule a $300.00 pick-up payment from a vendor.  Tillman scheduled it anyway, despite Cook's instruction and Elliott's recent directive that only payments in excess of $1,000.00 were eligible for pick-up payments.  In addition, LaTonja Wilson, another co-employee, who is black, complained of Tillman's confrontational attitude toward her.  When Elliott attempted to discuss these incidents with Tillman, Tillman denied the possibility that she had been wrong in any respect.

On October 30, 2001, Booker, Elliott, and Hill met to

4

discuss how to best manage Tillman.  Hill thought that Elliott needed to confront Tillman more forcefully, and she advised that he "pick up the pace" in managing Tillman.  After the meeting, Hill sent an email to the human resources director, Cindy McClain,[2] informing her of the meeting and speculating that Elliott's increased "pace" would probably result in Tillman "yell[ing] discrimination."

On November 6, 2001, Elliott spoke with Tillman about her work performance and some recent personal phone calls and emails made during work.  Elliott says in his contemporaneously maintained notes that Tillman heatedly disagreed with his critique:

> [Y]esterday from 4:00-5:15 p.m., she made 4 personal calls and typed up a 45 minute email to her friends about her birthday.  She claimed that she was on her break (which is actually scheduled for 2:45 [and lasts for 15 minutes]) ... [Tillman] said that she was very offended that I would call her into my office for this, that I was nit-picking her and that she does not appreciate it.  She said that I micro-manage her She said that she is not going to let me do this to her again.  She said that I have something personal against because she is a black female who wants to succeed....  [She] kept interrupting me and was very argumentative.

Tillman alleges in her own notes that Elliott was the hothead:

> I asked [Elliott]...is it because I'm a strong Black female?  He became extremely hostile and belligerent

---

[2]  It is undisputed that McClain lied at least once during her deposition.  Therefore, any testimony from McClain necessarily requires weighing her credibility -- which is the sole province of the jury.  For purposes of ruling on Southern's summary-judgment motion, the court has disregarded McClain's testimony in its entirety.

which he adamantly expressed with his finger toward my
face and stated, **"YES",** do you really want to know how
I personally feel about you? You are a smart aleck, you
know everything, and whenever a problem arises on the
floor your name is always there. You are hard to get
alon[g] with. You had a confrontation with Wilene Wyatt
and Carol Cook[.]... I asked him, why are you bringing
up an issue that [Booker] previously addressed and it
was Wilene [Wyatt] at [fault].... As [Elliott]'s face-
starting [sic] turning hotter by the minute I began to
feel like [Elliott's] next attempt would be to [start]
physically abusing me.

The next day, Tillman reported the meeting and argued that

Elliott's management skills needed to be evaluated.

Southern's supervisors meet at the beginning of each year to

discuss annual evaluations.  Before meeting, a list of "above

target" and "below target" employees is created for discussion

purposes.  Those employees rated "at target" are not listed.

Elliott did not list Tillman when preparing for the January 2002

meeting.  During the meeting, however, several supervisors

questioned why Tillman's name was not on the "below target" list.

So many managers complained of Tillman disrupting their

departments that discussion of her rating was tabled and another

meeting was scheduled solely to discuss Tillman's rating.

Around that time, Tillman completed an annual compliance

survey.  She responded affirmatively to a question asking whether

she had been harassed, intimidated, or treated unfairly.  She

complained that Elliott had "discriminated" against her and told

her "that it is personal not business why he treats me the way he

does."  A Southern investigator notified Hill and Elliott's

6

immediate supervisor, Carmine Reppucci, of the complaint.  Both
dismissed the complaint as unfounded.

In February 2002, supervisors met to discuss Tillman's
conduct and her interaction with other employees.  In addition to
Tillman's current and prior supervisors, Elliott, Booker, and
Fant, supervisors Rosemary Edwards, Genevieve Timmons, Angela
Brown, and Monroe Hargove -- all of whom are black -- provided
input as to Tillman's behavior.  Hill attended the meeting and
recorded the other supervisors' concerns so that Elliott and
Booker could incorporate those concerns into Tillman's 2001 year-
end evaluation.  The supervisors decided to rate Tillman "below
target."  In a document attached to Tillman's evaluation, titled
"performance feedback from other departments," the supervisors
concluded that Tillman's "overall performance indicate[s] that
[her] behaviors under mind [sic] management, which cause[s]
dissention, and break[s] down teamwork."

On February 15, 2002, Elliott and Booker presented Tillman
with her 2001 year-end evaluation.  Tillman expressed the belief
that her "below target" rating was retaliation by Elliott, and
she rejected the rating, writing in response:

> I do not agree with the <u>rating</u>.
> I am signing this document because of <u>fear of being
> terminated</u>.
> I would like to meet with a representa[tive] for Human
> Resources to express my concerns.  This review is the
> result of going to H.R. against B. Elliott, my
> supervisor.

(emphasis original).  The following day Tillman met with Hill.
Hill asked Tillman to provide documentation to support her
position that the evaluation was unfair.

On February 21, 2002, Tillman left several envelopes and
folders containing "over a hundred" documents for Hill's review.
After reviewing the documents, Hill sent Tillman an email, dated
March 6, 2002, requesting more specifically how the documents
proved the evaluation inaccurate.  In response, Tillman stated
that she provided Hill with "examples of emails where [Elliott]
said I fell short."  Tillman added that she had no "clue" as to
the basis of Booker's negative evaluation.  Hill responded, but
received no substantive reply from Tillman.

Tillman met with McClain and Reppucci on March 14, 2002 to
discuss the issues Tillman had raised in November 2001, her
complaint in the annual compliance survey, and her continued
performance deficiencies.  Tillman presented McClain and Reppucci
a document titled "below targe[t] review," which stated that the
2001 year-end evaluation "comprises of retaliation, personal
vindication and is racially motivated."  After a break, McClain
and Reppucci decided to demote Tillman.  They dismissed Tillman's
racial discrimination allegations.  In a "performance deficiency
notice" they specified that Tillman's "biggest development need
is to take responsibility for her actions.  She is quick to blame
everyone else and refused to accept constructive feedback."

8

McClain told Tillman that if she desired to remain employed, she
needed to draft an "action plan" and bring it to Hill the next
day.

Tillman returned the next day with her action plan.  It
stated that she "<u>strongly</u>" desired to work for Southern.  The
plan indicated that Tillman knew Southern's policies and
procedures and had followed them in the past.  When Tillman
pointed out that there were errors in her evaluation, Elliott
acknowledged some errors.  Hill told Tillman that her plan failed
to address the "biggest development need" -- taking
responsibility.  Tillman refused a verbal request to take
personal responsibility for her actions.  She maintained that she
had been "personally attacked, threatened and mentally abused by
Trac[e]y Booker and Brian Elliott."  Hill adjourned the meeting.

Hill and Elliott decided to fire Tillman.  Elliott called
Tillman back into the meeting.  Hill then asked Tillman to sign
or write remarks on the performance deficiency notice.  Tillman
wrote, "I don't agree that it is my fault that I have a below
target.  I have a below target because ... Management is why.  I
personally do not feel responsible for these actions."  Hill then
went over an inventory checklist, asked Tillman if she had any
personal property at the office, and asked Tillman to leave the
building.

## Analysis

A plaintiff establishes a *prima facie* case of unlawful retaliation under Title VII and 42 U.S.C. § 1981 by showing that: 1) she engaged in activity protected by Title VII; 2) an adverse employment action occurred; and 3) there was a causal connection between the participation in the protected activity and the adverse employment action. *Johnson v. Booker T. Washington Broad. Serv., Inc.*, 234 F.3d 501, 507 (11th Cir. 2000) (describing standard under 42 U.S.C. § 2000e-3(a)); *Webster v. Fulton County*, 283 F.3d 1254, 1256 (11th Cir. 2002), *cert. denied*, 537 U.S. 1046 (2002) (holding retaliation claim for race discrimination actionable under 42 U.S.C. § 1981); *c.f. Rice-Lamar v. City of Fort Lauderdale*, 232 F.3d 836, 843 n.11 (11th Cir. 2000) (stating that "[t]he elements of a claim of race discrimination under 42 U.S.C. § 1981 are also the same as a Title VII disparate treatment claim in the employment context."). It is a bit anomalous that Tillman has given up her claim of race discrimination and presents little, if any, evidence of having complained of race discrimination, but still relies on complaints of race discrimination as the protected activity that allegedly caused the retaliatory conduct. Tillman is, in effect, saying that she complained about race discrimination that she personally believed to exist but could not prove, but that she nevertheless enjoyed protection.

10

Only if she establishes a *prima facie* case, does a plaintiff create a rebuttable presumption that the employer unlawfully retaliated against her. *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 506 (1993). Southern challenges the first and third elements of Tillman's *prima facie* case. The court addresses them in reverse order. Southern argues that there is inadequate proof of a causal connection because too much time elapsed between Tillman's complaints and her firing. In order to establish *prima facie* causation, a plaintiff need only demonstrate "'that the protected activity and the adverse action were not *wholly unrelated.*'" *Farley v. Nationwide Mut. Ins.*, 197 F.3d 1322, 1337 (11th Cir. 1999) (citing *Clover v. Total Sys. Serv.*, 176 F.3d 1346, 1354 (11th Cir. 1999)) (emphasis original). Close temporal proximity provides an inference of causation and can establish causation in some circumstances. *Farley*, 197 F.3d at 1337. The Eleventh Circuit has held that when more than three-and-one-half months expire between the supposedly protected activity and the adverse action, proximity is insufficient to establish causation. *Wascara v. City of South Miami*, 257 F.3d 1238, 1245 (11th Cir. 2001) (citing *Brungart v. BellSouth Telecomm., Inc.*, 231 F.3d 791, 799 (11th Cir. 2000)). Tillman counters that she made off-and-on complaints until the day before she was fired. Her complaints, however, were not of racial mistreatment. Three months passed between Tillman's complaint that Elliott treated

11

her differently because she was a "strong black female" and her "below target" 2001 evaluation.  She did claim in February 2003 that her "below target" rating was the product of Elliott retaliating against her, but she made no complaint that she was being mistreated because of her race.  Southern fired her a month later.  Although Southern argues that it had the motive and opportunity to fire Tillman for more than a year and a half, the simple fact that it waited as long as it did does not prove that the firing was retaliatory any more than it proves it to have been justified.  The court gives Tillman the benefit of the doubt on the causal connection element, but that does not end the inquiry.

A plaintiff who complains about an employer's alleged racial discrimination must show that she had both a good-faith and a reasonable belief that the employer had, in fact, engaged in the unlawful conduct.  Wishful thinking is not enough.  *Little v. United Tech.*, 103 F.3d 956, 960 (11th Cir. 1997).  If her complaint has no foundation it is not protected activity.  *Id*.  She cannot simply make an unreasonable and unfounded complaint and then claim retaliation if an adverse employment action follows.  This standard has both a subjective and an objective component.  *Weeks v. Harden Mfg. Corp.*, 291 F.3d 1307, 1311 (11th Cir. 2002).  Southern challenges the objective prong, contending that Tillman's allegations of discrimination were unreasonable

and totally devoid of merit.  Tillman responds with the argument
that two events make her complaint objectively reasonable and
thus a protected activity.

Tillman complained to Elliott that he had left positive
comments out of her 2000 mid-year evaluation.  Elliott's failure
sparked Tillman to complain for the first time that Elliott
mistreated black employees.  After an investigation, Southern
concluded that Tillman's complaint of racial discrimination
against Elliott was meritless.  Nevertheless, Southern amended
Tillman's evaluation to include positive comments from her prior
supervisor, Booker, and to delete Elliott's comment that Tillman
needed "to pay closer attention to detail."

Objectively, Tillman's complaint of racial discrimination
went nowhere.  Southern did not discipline Elliott after it found
Tillman's allegations to be spurious.  Elliott's assessment of
Tillman remained largely unchanged, and he continued to supervise
her.  Although Southern had Booker add comments to Tillman's
evaluation, there was no change in the over-all evaluation.
Neither evaluation resulted in an employment action, positive or
negative.  No reasonable person in Tillman's position could have
concluded that Elliott had engaged in an unlawful practice.

Over a year later Tillman complained again.  She had spent
about an hour conducting personal business at work, after which
Elliott approached her about her conduct.  Tillman again raised

13

the race issue, challenging Elliott with having treated her
differently because she was a "strong black female."  Elliott
allegedly responded, "Yes," and added, "You are a smart aleck,
you know everything and whenever a problem arises on the floor
your name is always there."  This led to another determination by
Southern that Tillman's complaint of race discrimination had no
merit.

There is no allegation that Elliott or any other supervisor
ever uttered a racial slur or made a racial remark.  Nor is there
any evidence supporting Tillman's allegation that Elliott treated
blacks differently from the way he treated whites.  For aught
appearing, he was a supervisor who treated whites and blacks with
equally harsh criticisms.  Tillman's evidence consists entirely
of her perception "of the way [Elliott] talked to [minorities]."
This unsubstantiated, subjective evidence comes solely from
Tillman.  Her palpable animosity toward Elliott, coupled with his
undisputed "smart aleck" comment, do nothing to further the claim
that Elliott's motivation was something other than a personal
dislike for Tillman -- without regard to the color of her skin.
Tillman states in her brief that there was "a growing animus
**toward Tillman**" at Southern.  (Doc. #19 at 22).  The animus was
"**toward Tillman**," rather than toward the protected group to which
she belongs.  In light of the undisputed evidence, a reasonable
person could not conclude that Tillman was opposing an unlawful

14

practice when she complained.   It does not violate Title VII or
§1981 when a supervisor dislikes a "smart aleck."  The employee's
objection to the supervisor's judgment is not protected conduct,
at least not yet.

Tillman has simply failed to establish a *prima facie* case of
retaliatory discharge.  First, she has not established a
reasonable belief that Southern engaged in an unlawful employment
practice.  The court could stop its analysis there, but summary
judgment for Southern would be appropriate even if Tillman had
established a *prima facie* case.  Southern has rebutted Tillman's
*prima facie* case by producing evidence of a legitimate,
nondiscriminatory reason for her termination.  *Johnson*, 234 F.3d
507 n.6.  At this stage, Southern has only the "exceedingly
light" burden of production.  *Turnes v. AmSouth Bank, N.A.*, 36
F.3d 1057, 1061 (11th Cir. 1994).  As the Supreme Court has
emphasized, Tillman retains at all times the burden of persuading
the trier of fact that Southern intentionally retaliated against
her.  *Hicks*, at 507.

Southern claims several legitimate, nondiscriminatory
reasons for firing Tillman, including performance deficiencies,
unacceptable conduct, and her unwillingness to accept
responsibility for her actions.  It documented confrontations
between Tillman and co-employees in the last half of 2001.
Several Southern management employees, black and white,

15

recommended that Tillman receive a "below target" evaluation in 2001 because of her propensity for disrupting the workplace. Although Tillman disputes the existence of **some** of the incidents, her argument misses the mark.  (Doc. #19 at 24 n.15).[3]  Federal courts do not sit as "super-personnel department[s]" to adjudge whether an employer's decision is prudent or fair.  *Chapman v. AI Transp.*, 229 F.3d 1012, 1030 (11th Cir. 2000).  An employer can fire an employee for any reason or no reason, provided it does not fire the employee for a discriminatory or retaliatory reason. *Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1184 (11th Cir. 1984).[4]  Southern has met its burden of production.

An analogous case, *Holifield v. Reno*, 115 F.3d 1555 (11th Cir. 1997), further supports granting Southern's motion.  There, "schisms between [the employee] and colleagues, supervisors, and support staff" led to the employee's firing.  115 F.3d at 1564. The Eleventh Circuit held that the employer "clearly" met its burden under these facts.  *Id*.  The employee countered that the evidence against him was untrue and was "created solely in

---

[3]  Tillman specifically disputes "that Elliott said anything to her about personal emails."  In her response to her 2001 evaluation, however, she states that Elliott complained of her personal emails on November 6, 2001, just before allegedly saying "Yes" to Tillman's "strong black female" comment.  (Doc. #17, Ex.28)("He replied you forward an email to 15 people about your birthday and it took you 45 minutes").  The juxtaposition of this "dispute" and her next point -- that two Southern employees lied -- is incongruous.

[4]  Consequently, Southern's use of a "decision-making leave" for Tillman is inconsequential.  *See Knight v. Babptist Hosp., Inc.*, 330 F.3d 1313 (11th Cir. 2003).

retaliation for [his] discriminat[ion] complaints." *Id.* at 1565.
The Eleventh Circuit there rejected the employee's pretext
argument, holding that whether the proffered reason is pretext
rests upon the employer's provable motive, not the employee's
perception of it. *Id.* (citing *Billet v. CIGNA Corp.*, 940 F.3d
812, 818-22 (3rd Cir. 1991).

Tillman makes several arguments in an attempt to scratch up
evidence upon which a reasonable factfinder could conclude that
all of Southern's proffered reasons are pretextual. *Hicks*, 509
U.S. at 511; *Combs v. Plantation Patterns*, 106 F.3d 1519, 1530-32
(11th Cir. 1997).  In Tillman's opinion, Southern "engineered"
her termination.  She argues that Southern waited too long to
fire her.  This is hard to reconcile with her need to prove a
causal connection between her complaints of long ago and her more
recent discharge.  She contends that Southern's actions
demonstrate that its "characterization of Tillman as a terrible
employee is a **hoax**" and that "[t]he evidence supports the
**inference** that the characterization of Tillman as an awful
employee who would not accept responsibility is an **artifice**."

Self-serving speculation does not defeat Southern's
proffered reason. *Alexander v. Fulton County*, 207 F.3d 1303,
1342 (11th Cir. 2000).  Tillman's arguments for pretext are, like
those advanced in *Holifield*, due to be rejected.  115 F.3d at
1565.  The alleged conspirators who engineered Tillman's

17

termination include every member of management who had an

"attitude of animosity ... toward Tillman."  This includes both

white and black management employees, many of whom were unaware

that Tillman had ever voiced a race complaint.  The color of

Tillman's skin was apparently much more important to her than it

was to Southern.  Tillman has provided no reasonable basis to

suggest that Southern's legitimate, nondiscriminatory reasons for

her discharge were made up.  Accordingly, Southern's motion for

summary judgment will be granted by separate order.

DONE this 17 day of November, 2003.

WILLIAM M. ACKER, JR.
UNITED STATES DISTRICT JUDGE